May it please the Court, my name is Will Tomlinson, and I represent the appellants in this case, which I will collectively refer to as Stonebridge. The appellee is Trip Mate, represented by Alan Gallis here. This is a rather unusual case in that it was two theories were pleaded, two theories were tried. The parties submitted extensive briefing to the Court on Friday for those two theories, and the following Tuesday, the Court came out with an opinion which found in Stonebridge's favor on the two pleaded, tried theories, but against us on a unpleaded theory of implied amendment to the contract. Counsel, what about the notice the judge clearly gave you, I think the end of the first day? Judge, there's no question that in 20-20 hindsight, we know that that's what he was talking about. But what he said was course of dealing. Course of dealing is a theory for interpretation of a contract, not the amendment of the contract. If you look at my post-trial brief, I briefed course of dealing, because that's what he said. Also, Mr. Gallis here is a very competent lawyer. If he believed the Court was going to go on another theory favorable to him, he would have been all over it. But if you look at his post-trial brief, there is no mention of implied amendment. 20-20 hindsight says that's what the judge was thinking, but he said course of dealing. I took course of dealing. It's a term of art for what it is. So I think the answer to that is, Judge, we tried the two theories presented by Tripmate, and the judge came out with another theory, and it surprised us both. Just basically on our history, these two parties go back to 1989. They were in the travel insurance business. It was a very niche market. From 1997 until 2004, Tripmate was actually owned by our predecessor, Stonebridge. And in 2004, the founder of Tripmate repurchased the company, and in an arm's length transaction, they entered into two agreements, the 2004 managing general agent's agreement and a stock purchase agreement. Under those agreements, Tripmate basically performed every function of an insurance company. They designed the product. They marketed the product. They collected the premiums. They administered the claims. We basically were a financier. As a part of their function of marketing, they entered into contracts with third parties called travel organization agreements with travel organizations to perform the function of an agent to actually sell the product to the ultimate consumer, the traveler. As a part of this whole deal, Tripmate could take up to, and it was an up to number, 27% of the premiums, and Stonebridge was supposed to be assured of getting 14% in retention, which is basically an assurance of a certain level of profitability after you pay all the claims and so forth. As it turned out, Tripmate never really produced that level of profitability. That led to distress between the two, and in 2009, Tripmate indicated that it wanted to take its $60 million or so in business to another insurance company, and so the parties negotiated the termination agreement. In November of 2011, the parties went their separate ways under a termination agreement. In 2010, Tripmate came back to Stonebridge and said, we owe some profit sharing. We want you to pay that $500,000 in profit sharing after the parties have ended their relationship. I want to make three points. Number one is, I believe the trial court erred in sua sponte entering judgment for Tripmate on this unpleaded implied contract of theory, and again, I appreciate in 2020, it sounds like the court was telling us about it, but if you look at what the parties did and what they said afterwards, it's evident the parties didn't appreciate that. The trial court also erred in assuming that the implied amendment actually became a part of the termination agreement. Even if you assume there was such an implied amendment, it did not become a part of the written termination agreement. And third, and I'm not arguing about credibility, there simply was no evidence to support that there was this implied amendment. Not even some of the ambiguous language of either of these agreements? No. When you say no evidence? No evidence. This is a trust fund they're putting this into. Pardon? This is a kind of a trust fund that all this money is going into and coming out of? It goes into a trust fund. It's very vague about what's going in and coming out. Don't you think that C is very vague, provision C? No. Judge, all their premiums they collected go in, and they're allowed to take out for three specified reasons. One is refund of premiums. The trial court ruled that this is not a refund of premiums. That was the tripmate's theory. Two, they can take it out for their compensation. Yeah, but it says the amounts that represent the agreed compensation. Correct. That word agreed, and you have it two or three times, kind of puts off the agreement.  No, no, Your Honor. There is a separate document that the stock purchase agreement says they can take up to 27%. That was the agreed number, up to. They actually decided what they took out for compensation, but they couldn't exceed the 27% number. That was their limitation. And that's the point I'm skipping ahead now. There's no evidence that they ever took more than 27%. That would be roughly $15 million plus. There's no evidence they took in excess of $27 million. The notion that the trial judge had that they exceeded, that this would always be, I have to believe that they were taking more than they were entitled to, is based upon a, the judge never talks about that 20%. He never talks about what their compensation arrangement was. In other words, in order for you to say they were taking excess, you have to know what their compensation arrangement was, and then you have to have evidence that they exceeded it. There were no accountants testified in this case. No one testified about the 27% that they exceeded it. Zero people did that. So we're not talking about credibility. We're talking about a complete lack of evidence on that subject. Is it your contention that over these 20 years or so, there was no evidence that this money was being taken out of the premium trust agreement for this purpose? Judge, I'm not saying that at all. They had a right. The way this worked is all the money would come into this trust account. They had a right to take their compensation out. Under the agreement, they were required to pay the people downstream from them in the marketing chain. So when they tell us – Including this disputed amount that you have, these disputed amounts, these what, premium refunds or whatever? Correct. I mean, those – You couldn't read the paperwork that flowed between the parties over this time and find that TripMate was paying these people these premium refunds out of this premium trust agreement money? Well, first of all, it wasn't a premium refund. Well, whatever they call it. This was extra compensation to them as a kind of a bonus, if you will. Extra compensation. Certainly, you could find evidence that they were doing this. But that's not inconsistent with the agreement. In other words, they're supposed to pay the people downstream, and they're entitled to take compensation out. It's just as if they told us, we're taking money out of here, and we're going to pay our employees with it. So there was no evidence of what the judge was seeing, a course of conduct that he decided the case on? No. If you look at his footnote, the reason why he thinks that we know that they're doing something wrong is the underlying premise that they're taking excessive compensation, that they're overcompensating themselves. But if you look at his opinion, he never mentions the 27% limitation or how he reaches this concept that they're overcompensating themselves. You can read Mr. Gallus' brief. You won't find any mention of the 27% or any citation where people say we're compensating ourselves in excess of that number. All this is is you can take money out for compensation. They're entitled to do that, and what they pay with it is really their business. They always reported to us who they paid downstream. In fact, in the appendix, appendix page 27, there's a chart. This is a tripmate document, and all across the top are names of various entities which they would pay. These were some of their brokers that they would pay out of the premiums. It's agreed that all those payments counted as a part of tripmate compensation because under the contract, their 27% included all their payments. In other words, they had to pay their downstream people out of their 27%. And so the fact that we know that they're paying downstream people out of this money doesn't tell us anything that's going on improperly. And these funds were not covered by the termination agreement. They didn't have any right under the termination agreements to pay these out after termination or as part of termination. No, the compensation sections of the managing general agent's agreement did not survive. In other words, all that survived, this Article C that we talk about in which the court focused on, if you read that, it is about their tripmate's duties. All of it talks about is tripmate's duties, tripmate's duties to collect premiums, to put them in this account, to account for those premiums, and it gives them permission to remove monies for three things, one of which is completely irrelevant, but one is this concept of a refund of premium, which the court said this is not, and the other is for compensation. So the real issue is did it or didn't it survive in the termination agreement? Correct. And the other thing about this is it is admitted by Mr. Finkel, he wasn't surprised. I mean, the reason why he sued us is because there's no money in there. He said, well, I thought I could just take the money out. Well, he understood there wouldn't be money. This money came from premiums, and he agreed, and everyone understood that there weren't going to be. I mean, there was going to be a few premiums trickle in at the end, but premiums are basically going to dry up. There wasn't going to be any money in that fund, and that's exactly what happened. They all understood that when they entered into this agreement, that there wouldn't be any money there. Well, it would be possible for there not to be enough premiums to pay the B and C items. You know what I'm talking about, agreed compensation and the traveler assistance services. Right? That would be possible. Traveler assistance services, additional. Yeah, but would it be possible? It would be possible. For there not to be enough money? Right. I don't think so. To pay B and C. No. In other words, what does the record say about that? It doesn't say anything about it. Well, see, that issue wasn't being tried, so we really weren't addressing that. If we were trying that issue, we would have had to have a completely different set of evidence and different witnesses. And as you were trying the case, this issue was farther from your mind. Absolutely. We stipulated that the written document was the managing general agent agreement just prior to trial. He pleaded that the written document was the managing general agreement. There was no suggestion by anybody that there was an amendment to this. But the judge brought it to your attention a couple of days before the trial was over, right? Well, it was after the first day of the day-and-a-half trial. During the trial. During the trial. Yeah, you agree with that. But what he said was course of dealing. Course of dealing is a contract interpretation. That's a term of art. You look it up. And I briefed it. Term course of dealing is a method for interpreting. And since we were arguing about the interpretation of the- You interpret the contract to believe that it's modified to this extent, right? No, what we were talking about is whether or not the words return of premium encompassed profit sharing. That was the interpretation we were talking about. And that's what I briefed. Because that's what we were trying in the case. And I understood that notion that he was saying, well, could the parties by their course of dealing have it? And I briefed that issue. But that's not what he concluded. He concluded that there was an amendment, which is a different concept. And it was based upon this notion that the parties were-that if you didn't count this, that somehow this would be excessive compensation, where there was zero evidence of that. You'd have to have the counting testimony to establish that. But there was none. He decided that the contract that you were terminating included this course of dealing that showed how the money should be divided. Is that right? He used the term course of dealing. And, again, that was based on his-his whole theory of this amendment is based upon the underlying concept. Because in order for there to be an amendment, it's just like we all learned in Contracts 101. There has to be mutual assent. And there's-both parties have to understand that this is what's going on. What Mr. Finkel secretly understands or believes doesn't matter. You have to look at what did Stonebridge know and understand? Now, he got to that by saying, well, you would have to know that they were taking more money than they were entitled to. But there is no evidence that they were taking more money than they were entitled to. That's where you get to the 27%. Without that piece of the puzzle, you don't have any evidence of that. Our people never said that. You know, he would draw on things like somebody said, well, that would increase their compensation. It's true.  It's not a question of whether they increased their compensation. It's whether they increased it to more than the contract allowed. They had a right to choose their amount of compensation. He said, well, why would they choose less than 27%? It's because they had also a contractual obligation to produce a certain level of profitability. And those two go somewhat hand-in-hand. There's two components to that. How much they take out as compensation and, two, how much are the claims? So they're trying to balance those things and produce a result for us. They never succeeded in producing the right result, but that's what they were trying to do, presumably. Were there times that they didn't take out as much because they wanted the residue to be the agreed amount that you just talked about? They didn't take out 27%. They were below 27%. In fact, if you look back, and I'm running over my time here, but back in the – and this is kind of anecdotal because this is not what we were trying, but on the very last in the addendum, page 28, there's a chart from TripMate showing total premiums for a month, which are $4 million, and how much did we get? We got a tiny shy of $3 million. If you add that up, you figure out we got 73.3%. That's with deducting everything, including TripMate's compensation and including a profit-sharing payment. If you do the math, for us to get 73.3%, they're taking less than 27. Barely. Barely, but less. And so the question is, where is the excess compensation? And it's not there. What would be the – what would have been the additional evidence that would reasonably have been offered if the parties had understood that this additional theory was being considered by the court? Well, you'd have to offer accounting evidence as to what they took and what percentage it was and whether it violated the contract. And did somebody know about that? And that's what you would have to talk about. But I don't want to lose – You couldn't examine the exhibits that were in evidence and do that? Pardon? You couldn't examine the exhibits that were in evidence and do that without the help of an accountant telling you what you were seeing? Is that what you're saying? Could somebody look at all the – I mean, there wasn't a lot of accounting records in evidence because, again, that wasn't the issue we were trying. I mean, I'm aware of some. They don't show 27%. They show less. But I also want to make this point because I think this has gotten lost. Even if there was an implied agreement, it did not become a part of this contract. If you read the agreement, when it specifies that Article C will continue, it specifies it says the contract is attached. The managing general agreement is attached to the termination agreement. Didn't become a part of the termination. Right, did not become a part of the termination agreement. And whether or not it would have existed under the managing general agent agreement doesn't matter anymore. And that's what the court lost sight of. Those clauses only continue to exist in the context of the termination agreement. So if we don't – if this amendment doesn't become part of the termination agreement, then it doesn't exist anymore because the terminating – the managing general agreement was terminated by agreement of the parties. Thank you. Mr. Gallas. Good morning. I'm Alan Gallas, and I represent TripMate, Inc. I'd like to start off by thanking Judge Shepard for reminding me that I'm in Kansas City and not – or in St. Louis and not Denver. Thank you. Saw him on the elevator this morning, asked him where the 10th Circuit hearing rooms were. He said Denver, Colorado. Some of us would like to be in Denver. Well, I'm hoping that after this argument you don't suggest that that's where I ought to be. This is a case that spanned really 20 years. The relationship between TripMate, Inc. and Stonebridge was a very, very long and really a very successful history until the end when TripMate made a decision that it wanted to terminate the agreement with Stonebridge and move on to a different company. The trial court recognized that. The court understood that there was history between these two companies. We offered evidence at trial. And I will confess, and although I'm reluctant to do this, I'm going to anyway because I can't help myself, there's no question that the judge threw me a curveball. And since I was in St. Louis, I really did feel like having a little relationship to baseball would be appropriate this morning. And we were thrown a curveball, but it was still a baseball. The judge didn't pitch a football at us. In other words, when the judge told us that he felt the course of dealing was important, true. We had to try to understand what the judge exactly meant by the course of dealing. But I think what the judge was saying was there's a 20-year history of how these two companies operated with each other, and it's going to have an impact on the issues before the court. When we first explained or when we first notified Stonebridge that there were profit sharing payments due, the record will reveal that we were told two things. One, we don't know anything about profit sharing. We have a 20-year history. We have no idea that you were even engaging in this profit sharing, in this methodology of adjusting premiums. And if you did, it's illegal. You can't do it. And we were a little taken aback by that because the practice had been going on for the entire time that the companies had been doing business with one another. And so much of the focus in this case was proving to the court's satisfaction that this rate modification device was something that was known by the defendant, Stonebridge. And there was substantial evidence offered on the issue of the existence of the profit sharing relationship and the methodology that was employed and the notice that was given specifically to Stonebridge. And was it over 27 percent, Mr. Gelles? You know, it never came up, Judge. The first time we really heard about that was very late in the game, although, admittedly, Stonebridge had focused on that. With all due respect, from my client's standpoint, it's a red herring. And the reason it was a red herring was because nobody ever talked about the 27 percent during the entire time that the companies were doing business with one another. Even the time that Stonebridge owned TripMate, it was never part of the discussion. The 27 percent comes up in the stock purchase agreement that was executed in 2004. If you look at the indemnification provisions, Article 13 maybe, Article 14, there's actually a sunset provision in there that says that that agreement terminates all of the obligations 12 months after date of execution. That really wasn't what the parties were focused on. That's what the lawyers got focused on after the lawsuit was filed. So was it over 27 percent? Probably not. But I don't think that really is the dispositive issue, and I'm quite certain that's not what the trial court believes is the dispositive issue. So tell me in paragraph 4B of C, where it says the amount that represents the agreed compensation, and later there's another squiggle phrase I didn't even come up with earlier. It says the compensation is set forth in writing. What is that referring to, in your opinion? Well, Your Honor, I don't have the article in front of me, but what I do believe the compensation is referring to is the compensation that's described in Article F, perhaps, that talks about the amounts that will be paid to trip mate, and I believe that's what it's making reference to. Well, F also punts, F says compensation levels set forth in writing and acts like it's already been done. Right. They keep referring to that phrase both places. Understood. Where do we go to find that? You find it in exactly what was presented at trial, Your Honor, because there is no other written document that's going to contain the answer to the question you've asked. So it's not that there was a set compensation formula. There just wasn't, and you won't find it in the evidence because it didn't exist, and I can assure you if it had existed, it would have been put into evidence by Stonebridge at a minimum or by us. But I think it goes to your earlier point. You pose the question, is this contract ambiguous? And I think that clearly you can make the argument that it is ambiguous. When I say ambiguous, I don't mean that you don't understand generally what the parties are supposed to be doing, but there's no real meat on the bones. What you really have is a contract that sets forth generally the rights and responsibilities of both of the parties, and it clearly sets forth that trip mate is the managing general agent of Stonebridge, and as Mr. Tomlinson said, what that means is for all practical purposes, trip mate is Stonebridge. It has the right to design and develop the product. It has the right to set the premium rates. It has the right to adjust all of the claims. It is the insurance company for all practical purposes. What's missing from the contract is what I described as the meat on the bones. There is no formula in writing that sets forth exactly how that's going to be carried out. So your argument is that this extra compensation arrangement that's an issue here in this lawsuit was not part of the written operating agreement that was attached to the written termination agreement. Is that what you're saying? That's not what the argument was, Your Honor, even though I see Judge Benton is nodding his head yes. What we really, the issue is presented at trial, if I may just elaborate briefly, and I won't answer your question directly. It was trip mate's belief from the very beginning that this refund, that this, what you're now calling compensation, and what has been described as compensation really was a refund of a premium and was covered specifically by Article C as a refund of premium. Now, the court ruled against trip mate on that theory, but that was the argument that was posed, and that was the belief that trip mate was under throughout the entire 20-year period. Let me put it in perspective, just if I may, for a moment. The wholesale travel component of the business that included this profit-sharing arrangement was a very small piece of the totality of the business that was involved, a very small piece. And the way it was charged to the travel, the tour operator, let me put this in perspective. You have a wholesale tour operator that goes out and puts together a tour and then sells it to the public at retail. This tour operator is the named insured under the travel insurance that's sold by trip mate that's underwritten by Stonebridge. And the only monies collected by trip mate, according to trip mate, it's called a premium. And so any monies given back, trip mate says, is a refund of the premium. The judge found that that's really semantically not correct. What the judge determined was that the person who is the, who buys the travel package and goes on the tour is really the person who is the owner of the insurance. We don't happen to agree with that, but we respect the court's getting to where it got to that way. But that's why there's this footnote that talks about the policy. Pardon me? That person is the owner of the policy. According to the opinion as written, yes. But the testimony was not. Because you can have a lot of insureds that are not owner of the policy. They get a certificate of insurance from the wholesale travel operator. Factually, that's really what happens. So that was the case as it was presented. So you can see where the confusion comes between the use of the term compensation and refund of premium. The court found this to be compensation. Now, it's our contention that the court got the right result. Are you going to answer my question? Is the answer to my question yes or no? This was not compensation to Tripmate. Tripmate got not $1 of the monies that were paid as profit sharing, not $1. It was strictly a pass-through to the wholesale travel operator. Well, my question was the extra compensation arrangement at issue in this case was not part of the written operating agreement attached to the written termination agreement. Yes or no? I say it was. It was? Yes. I say it was. Absolutely. Is it in the phrase amount of compensation to be agreed upon in writing between you and them? It is. Actually, the evidence we believe demonstrated that it was part of the amounts that Tripmate was authorized to pay on behalf of the company as a refund of premium. That was the argument that was presented at trial. And then, of course, the judge made a different finding. But to be consistent, Your Honor, we always believe that to be a refund of the premium because that's all we ever collected from the travel operator. So I don't know if that specifically answers your question. Well, do you think the issue on which the judge rendered judgment, do you think it was fairly tried by the parties? We have a lot of cases in the Eighth Circuit, and they go back years and years and years, that use the term a court may grant a recovery on a theory not pled if it is fairly tried by the parties. I don't think there's any question, and I think everybody on this panel knows the trial judge well. This was a fairly tried case. Yeah, but it's the issue we're talking about. Oh, I think this issue was in the case from day one. This wasn't a surprise. We talked, and I apologize for interrupting you. No, go ahead. Go ahead and finish. We talked about the course of dealings of these parties, starting with the motions to dismiss that were filed in this case by Stonebridge. This was not a secret that we believed that these parties had engaged in this practice for a total of 20 years. And so this issue was so ingrained in the case that I'm a little surprised that we've gotten so sidetracked on it, although I understand why, because as I indicated, the judge did throw us a bit of a curveball. So this was not an unpleaded issue that the judge amended the pleadings by implication because the evidence was put before him. The evidence was clearly there, and here's the way I directly answered your question, Your Honor. We sued for breach of contract. The court found a breach of contract. We said it was a refund of premium. The court found that it was an amendment to Article C different than a refund of premium, that it was a practice that the parties had engaged in for 20 years. So it was part of the agreement that was terminated. It was not terminated. That part of the agreement was not terminated. That's Article C, and it specifically survived. And the argument that the MGA agreement was terminated is true, except it expressly states in the termination agreement that Article C survives termination. So everything that's part of Article C survives as well. Well, if this was fairly tried by the parties, why is it that this term, implied amendment, is first used by the district court in its opinion? I think, and I'm speculating, because it obviously doesn't work. Don't words have meaning? I mean the court said he was thinking about course of dealing, but isn't that different from implied amendment? I think it is.  So how can implied amendment be a theory that was fairly tried in the case if no one knew that it was there until the district court describes it in his opinion and judgment? Because my opinion of that, Your Honor, is that because the court is talking about the course of dealings that the parties had engaged in over this protracted period of time, that it is fairly tried because his ruling is based on that course of dealing. What he does is he, and I think if you look back at Article C, what he does is he's adding a provision to Article C that's an additional permissive payment out of the trust account. But in both instances, whether you call it a refund of premium or you call it an implied amendment, it's clear that the obligation is that of Stonebridge's, because what the provision says is that Tripmate may pay on behalf of the company, on behalf of Stonebridge, these amounts, and then it describes what those are. Now admittedly, Tripmate believed it was always under the refund of premium category. The court found that really technically it's not a refund of premium, but the conduct, the transactions itself are identical under either theory. Did you brief implied amendment in the post-trial brief? We did not, Your Honor. Why not? Frankly, I can't disagree with what Mr. Tomlinson said. We were still focused on the language of the contract specifically, and we did not go beyond the language of the contract specifically, Your Honor. So it's your position that Stonebridge was always obligated under the surviving Article C from all the way through the operation of this contract and this litigation. Is that your position? Absolutely. I haven't used all my time, but I think I've answered your questions.  Mr. Tomlinson, you have a minute and 13 seconds. Let me just say that, again, this is a divorce. These are two sophisticated companies with lawyers negotiating over months. Everyone understands in a divorce, if you don't put it in the divorce decree, it doesn't count. Yeah, but in this agreement, you can't even figure out what was put in writing or what was going to be agreed on in the future as the compensation. I don't know that you ever had a marriage. No, Judge, that's not correct. The stock purchase agreement was entered into simultaneously with the managing general agent's agreement. This isn't in evidence, but this is what happens. In these managing general agent agreements, they have to be filed with the state. You have to file them with the Department of Insurance. Nobody wants to say what our compensation arrangement is, so they put it in another document so they're not telling the other managing general agents what this guy's getting, so they put it in another document. That's the document. It says in writing, there's the writing, entered into simultaneously by the parties. So that was the controlling compensation provision, and no one talked about it because that wasn't the issue. Thank you. Thank you. The case has been well briefed, and it is submitted. Thank you, counsel.